McKinney v. City of Middletown May it please the Court. Mr. Chief Judge, Your Honors, my name is Samuel Adkisson and I represent Mr. William McKinney in this case. Your Honors, this is a case where the police brought an untrained patrol dog into a 7x7 cell, loosed it on a mentally ill pre-trial detainee, beat him with a baton, and shot him with a taser while he was pinned to the ground with his hands behind his back. The District Court then took this case out of the hands of a jury by holding that no reasonable juror could find the force excessive and by resolving genuine disputes of material fact. What inferences do you think the District Court made in favor of the movement? Yes, Your Honor. First, we believe that the District Court in this case made inferences about when the dog was actually deployed to attack Mr. McKinney. Now, if we look at the video in this case, which the District Court judgment below doesn't cite at all, it indicates that the police canine goes directly into the cell and potentially may have bitten Mr. McKinney immediately. The District Court judge, however, credits the officer's account of this case that the dog was only deployed subsequent to some other altercation within the jail cell. So we think that's one example. We also think the District Court, despite flagging a dispute about whether or not a warning was given in this case, functionally resolves what is a material fact implicitly in its judgment in finding that the force wasn't excessive. Didn't your client concede that he didn't dispute that there was a warning given about the dog? Your Honor, respectfully, no. In the 56A2 statement, Mr. McKinney explicitly denies that he was given a warning. What about his testimony, his deposition? He's quoting from the police report, stop or you will be bit. You will be bit, close quotes. Do you have any reason to dispute that that occurred? No, I do not. That's a sworn testimony though. Yes, Your Honor. When we look at the deposition with a broader view, what we see is that Mr. McKinney indicates that he doesn't and he was mentally ill and he was spiraling out of control. And so he only remembers bits and pieces. And so there he's indicating that he doesn't have any memory of everything that happened. And so Mr. McKinney indicates he can't dispute every little thing the officer said. And if we read through the whole... It's not a little thing though, is it? It's not a little thing. It's not a little thing, Your Honor, but a full view of the deposition. You said that he entered with the dog without any warning. And then the video, the fixed camera outside the door of the cell, does it show the first officer propping the door open with his foot and the dog is visible to your client in the cell? Your Honor, I don't believe so. When we look at the video, the door is cracked a tiny bit. It looks like about a centimeter to me when I view the video. Yes, Your Honor, very little. And in fact, the officers in this case concede and defendants concede in their brief that Mr. McKinney did not see the dog before it went into the cell. That's a concession the defendants make here. And viewing the facts in the light most favorable to Mr. McKinney, this Court should assume the same. And so insofar as Your Honor thinks that's relevant or a material fact, that inference should be viewed in favor of Mr. McKinney and in favor of allowing this case to move toward a jury. Additionally, Your Honor... So let me just go back to just Droney's question about the 56 statement. I'm looking at paragraphs 27, so JA 277 and paragraph 28. And at least in paragraph 28, it says, the barking canine further agitated Mr. McKinney and exacerbated his already deteriorated mental and emotional state. And then in 27, the response is it is likely, if not certain, that Mr. McKinney heard the canine barking and was aware of its presence. Yes, Your Honor. And so the point there is that that fact was in dispute below. But viewing every fact now in the light most favorable to Mr. McKinney, because this Court reviews it de novo, there is a dispute about that that's live. What's the dispute? The dispute is whether or not he actually... Did he ever testify? I never knew the dog was coming into the cell. I never was aware the dog was even out there. All of a sudden, the door just entered, the dog comes in and bites me in the leg. Did he ever testify to that? Yes, Your Honor. In his deposition, Mr. McKinney does indicate at some point he doesn't know whether a dog is present. And there is some confusion in the deposition. He goes back and forth and sort of... He has a hard time understanding what happened. He got clubbed in the head while he was in the cell. Why is there a dispute if one side says, I can't remember, just say. And the witnesses on the other side say, we provided a warning that this hunter, the dog, was going to be used. Why is there a dispute that arises from that? Yes, Your Honor. If all of the witnesses on behalf of the defendants here said that, that might be one thing. But here, two of the three officers don't mention any warning. The after-action arrest report, which is very detailed, mentions other warnings and things like that, also doesn't mention the warning. Why is that a dispute? So the fact that some people are silent, one person says that there was a warning, and the plaintiff here can't remember one way or the other. Why does that generate a genuine dispute of material fact? Because a court should evaluate the record in the whole. And additionally, when we look at the video camera, we don't see Officer DeArest's mouth moving like he's giving a warning. And the speed with which the dog is deployed in the jail cell could lead... Is it enough by way of a warning that the dog barks before entering the cell? No, Your Honor. None of the other cases dealing with dog warnings indicate that a barking dog would be enough. But additionally, Your Honors, even if you believe there is no genuine dispute of material fact, a reasonable juror could still find that the force deployed in this case was excessive, including the decision to use the canine in the first instance and the force that was deployed against Mr. McKinney while he was on the ground in the jail cell. Isn't your point, your larger point, that you think that what we need to do is to resolve all factual ambiguities in favor of your client? And in your view, as I understand it, correct me if I'm misunderstanding, the fact that the narratives of the various people in the cell are different, perhaps through omission, means that there are things that still need to be fleshed out further. Correct, Your Honor. And if the court looks, and it should look at the video de novo, if it looks at the video, reads the officer's accounts of what happened, they just don't line up. And so when we look at the overall narrative, like a jury would be able to do, and make those important credibility determinations. Tell me how it doesn't line up. Be more explicit. Yes, Your Honor. I know it's in your briefs, but I want to understand. Yes, Your Honor. One prime example of this is with respect to when the officers decided to deploy the dogs and whether they were going to in the first place. Now, the officers indicate they weren't going to and that they hadn't decided whether or not to bring them in. But if you look at what actually happens in the video, the officers put on purple gloves that are designed to help them when they're doing a cell extraction before they go and get the police canine. Now, Officer Siebold, in his after action report, he indicates he didn't put the purple gloves on until right before they went in. That's not consistent with the video, and it is consistent with the decision to go and get that dog so that they can attack the prisoner with it, Mr. McKinney, in the first instance. So that's one example of it. I mean, additionally, the officers portray this as an orderly entrance into the cell. The video belies that. It's a rapid movement. The officers all enter immediately, and they're all deploying force immediately. Let me ask you one housekeeping matter before I forget. Do you challenge the dismissal of the state law claims? Yes, Your Honor. We challenge the dismissal of some of the state law claims, specifically the negligent assault and battery claims. Where is that in your briefs? Your Honor, it's under the governmental immunity section. So the district court judge below resolved the negligent assault and battery claims using the same standard relevant to the excessive force claim. So the district judge below says if the force was unreasonable, there can't be any sort of assault or battery. Would you then also address the qualified immunity issue? Yes, Your Honor. So with respect to the decision to deploy the dog, we think it's clearly established that by precedent from across the country that you have to give a warning before you deploy a dog. Two circuit court decisions. Is that correct? The fourth, Your Honor, the sixth, the seventh. Additionally, it's clearly established in the Second Circuit in Hemphill that you have to give a warning before deploying significant force. And when we turn to something like the tasers or the gratuitous force inside of the jail cell, you have a case Garcia, which was decided in 2015, but was about 2010 facts where the officers use a taser on someone after he's no longer resisting, just like is the case here. And the court holds it was clearly established as of March 2010, a couple of weeks after this incident, that that is gratuitous force. And your view is that we don't, that Hemphill is sufficiently specific to provide, to strip these officers of qualified immunity? Hemphill, in conjunction with the other cases around the country, this court held in Tarabisi, footnote 12, that cases from other circuits are sufficient to put someone clearly on notice about what their constitutional rights and obligations are. Besides the Fourth Circuit, I mean, the Sixth Circuit and was it the Seventh Circuit, I think? Seventh and Ninth, Your Honor, yes. So, but the Fourth Circuit is the circuit that squarely dealt with the issue of warnings and canines, is that correct? One of them, Your Honor, yes. Is there another one that squarely dealt with that issue? Your Honor, I think that the Sixth Circuit has, in Campbell, for instance, indicated that one of the factors they're looking at when they decide force is excessive is whether or not a warning is given. We think the Seventh Circuit case cited in the brief Bay also clearly indicates it. The point is a reasonable officer in the Second Circuit, understanding Hemphill within the circuit and understanding the cases from around the country would be put on notice. And additionally, the use of force within the cell, the gratuitous use of the taser. You agree, though, that he wasn't cuffed at the time that he was tased? Correct, Your Honor, yes. He was not fully handcuffed at that time? Not handcuffed, Your Honor, but we believe he was not actively resisting at that time. Yes. Thank you very much, Your Honors. Thank you. Thank you. Judges of the Court of Appeals, good morning. My name is Tom Gerard and I'm arguing this morning on behalf of the defendants. I'd like to kind of jump right in to Judge Droney's point. It is undisputed in this case that we have a scenario where the plaintiff says, I don't remember hearing the dog, but I don't dispute that Officer D'Arresta, when he came into the cell, said, police with a canine, stop or you will be bit. There is no dispute about that at all. And the video doesn't help us because the plaintiff covered up the camera inside the cell. So we don't see what happened inside the cell. All we see is a dog going from outside the cell to inside the cell. And we have undisputed testimony that the police canine handler said, police with a canine, stop or you will be bit. He does not dispute that at all. What about the other camera that was in the hallway? Yes. The other camera in the hallway shows the police officers staging, and this is a measured response. I mean, they said, come out. He won't come out. They're just trying to move him down the hall. You can see the dog in the video. You can see the dog's head, and you don't hear, but you see the head is bobbing up and down. The dog is barking. The plaintiff says I didn't hear the bark, but that cell was open a lot more than a centimeter. It was open, the police officer has his foot in the door. Essentially, keeping it open, propping it open while they communicate. And then the plaintiff grabbed his mattress and was barricading himself in, making necessary the force that was used. It starts with a baton. He grabs the baton. He's now potentially has a deadly weapon in his hand, and that's when you have to have the dog. The dog bites at that point, takes down the plaintiff. He's now fighting the dog. He's got the dog by the collar. He's resisting still. Then it makes necessary the strike with the baton in the green area of the thigh. It still doesn't stop the plaintiff resisting. Then taser on drive stun. It's pain compliance only. Pain compliance worked. This is textbook from a police academy on an escalation of force made necessary by the resistance. Why was the dog necessary in the first place? What Officer Seabold, first officer in, goes in with a baton sideways, trying to pin the plaintiff against the wall so he can be handcuffed. The plaintiff grabs a hold of the baton. Now, if the plaintiff wins that tug of war, he has a deadly weapon in his hand. Because a baton, if it's hit in a red area, is a deadly weapon. So you need to get him on the ground immediately. That's why the dog then is a bite and hold, put him on the ground. And that's exactly how Officer D'Arresta testified. So the officer anticipated that a dog would be necessary. Is that what you're saying? Well, the team anticipated, let's get the police dog there. The first reason why you have the dog there that's explained by the team is that many people will hear the dog and say, I'm not messing around with the dog. Now I walk out and there's no problem at all. But the dog is also an asset to be used. It was not the first asset used. The first asset used was orders and commands. Then it was the baton, not with a strike, but an attempt to pin the plaintiff against the wall so we could be handcuffed. And when he now is in a wrestling match with the baton, you have to escalate. They entered the cell to prevent injury to the plaintiff. Well, they entered the cell for the purpose of securely getting the plaintiff down to the other cell. That was the whole point of it, right? But your language is in order to prevent injury to the plaintiff. That's one of the reasons. It's kind of an odd case, isn't it? That in order to prevent injury from the plaintiff, a dog is brought in. That then causes injury that results in hospitalization. Well, the police never know what they're going to get when they go into these situations. Most of the time, a prisoner will see that he has no chance of winning the battle, and they give themselves up and everyone is safe. The overwhelming show of force sometimes is the best persuasion. But in this case, it's not as if they went, like the Fourth Circuit case Judge Lowy is talking about. They sent a dog in to bite anybody you find, and that person got bit in the head while they were sleeping. That's extreme. They didn't send the dog in to attack the prisoner. The first move was they sent a police officer in, not to strike the prisoner, but to pin the prisoner with a baton. And now the prisoner's fighting, and now he gets a hold of the baton, and it's all happening quickly. And we would have had it on video if he hadn't blocked the camera. I understand that ultimately what you're saying may turn out to be exactly as you say in terms of why these things happened and how it happened. But as to the question of whether at this stage, at summary judgment stage, whether there is enough there. And I understand the difficulties of what happens in a certain circumstance where someone says I don't remember. And that can then be bootstrapped in a way that that person can then say there are factual disputes because I don't remember. But you've got the case of USP Robinson where the court said, and I quote, this is Judge Meskel's opinion. The absence of a record of an event which would ordinarily be recorded gives rise to a legitimate negative inference that the event did not occur. And so here, according to your adversary, two of the three officers incident report made no mention of a warning being given that a dog was to be deployed. Why doesn't that create a question of fact as to the nature of the warning? Well, the police officers write their own reports regarding what their own involvement was. It's the canine officer's use of force involving the canine. It's his job to explain what the facts are that justified his use of the canine and how that all transpired. The other officer who used the taser, he's responsible for justifying the facts that led to his use of taser. And then Officer Sebald used the baton, and so they each have their own world that they report. So there's no expert testimony that this is the way it's done, that police officers are required to write the history of everything everybody did at the scene. They never do that, and so that would not create an issue of fact. We have a 56A2 requirement in our state for summary judgment, where a plaintiff has the burden of demonstrating that there is an issue of fact by showing what is the admissible evidence that will come in at trial that will prove, or if believed, or will join this issue of fact. And the fact that someone can say, well, somebody was there and they didn't say what this man said. Well, so maybe he's lying, because without any type of mandate or some law or policy that says each one of these men has the responsibility to do that, it would not rise to the level of an issue of fact, it's rote speculation. Let me ask you a follow up question. Do you agree that if there were a genuine dispute of fact as to whether these officers or whether that officer provided the warning that they were going to the cell, that that would eliminate qualified immunity for now as a grounds for disposing of the cell? No, I don't think qualified immunity would be eliminated at all, regardless of any of these disputes we're talking about. And the reason is that we have a police officer who has a dog outside the cell and the dog is barking. And so the plaintiff can say all he wants, I didn't hear the dog, but he's four feet away from the dog and the dog is barking actively. So a reasonable officer would conclude that they know the dog's- I've heard from your adversary that the fact that the dog is barking is not enough, it's not a warning. Of course it's a warning, it absolutely is. In the Fourth Circuit case, when the dog is on watch and the dog is four feet away from you and the dog is barking loud, that is absolute warning that you will be bit unless you comply. The Fourth Circuit case involves someone just letting a dog roam through a house until he found somebody and they found someone on the second floor and bit them. Now they said in that case, you should be screaming, police with a dog, I'm about to release a dog if you're in there, come out. Totally different story. But if the barking dog standing right out the cell is not enough, that is not clearly established. I mean, if we find that that Fourth Amendment mandates the words in addition to the barking dog, that's not clearly established under our facts. The case to read that helps decide this case is the city and county of San Francisco versus Sheehan. It's in our brief, it's the latest Supreme Court case on qualified immunity. And it's almost on point because that dealt with an emotionally disturbed person also, who after the fact the plaintiffs felt the police botched it, they should have been smarter with their strategy, they should have had a better team. That person had a knife, the police went in, that person wound up being shot fatally, and there was still qualified immunity. But the court makes the effort. The Supreme Court says, for about the sixth time, we're going to remind everybody else in the country that qualified immunity talks about clearly established with particularity. So the fact that the Fourth Circuit case exists in the late 1990s where a police dog was roaming the house is not notice that if I have a barking police dog right outside this door, and that door's open and the man's there, that he doesn't know that he's about to get bit. Could I just ask you why, it would have been nice if we had had a view from the interior camera about this incident. It would have been nice. Yeah, why was he covering the interior camera? Do we know that? because that's one of the reasons why he was moved to the padded cell, right? Because the police couldn't observe. Yes, well it was his own reasons. He was being obstinate, he was not cooperating, we took the toilet paper down for him once. And then he put it back up again, and we don't know. I mean, we arrest people, he was arrested for robbery, there was no incident in connection with his processing. He was put in the cell, and he put the toilet paper up again, and we said, all right, you're going to the cell where you can't do this and you can't hurt yourself, it's the padded cell. And that may have escalated to, now we're going to call paramedics to see you, and maybe you're a medical emergency, you need to go to the hospital. But we never got that far, because he blocked the cell. If I could just add one quick point about the negligence claim, because that was raised. The negligence claim was not even defended, it wasn't opposed at summary judgment, all right? So it was not in the opposition brief, it was not an oral argument, it was granted absent objection. It's raised for the first time here on appeal, and so this court doesn't typically do that. So that's one good reason not to deal with the negligence claim. The best reason is that the plaintiff is raising this exception to governmental immunity known as the identifiable person at imminent harm exception. It's black letter law in Connecticut. You cannot raise that exception unless you have pled that there was that exception in your complaint, that the person was identifiable, or in your reply to the affirmative defense. Neither of those is there, that's black letter law, Haynes versus City of Middletown. We don't have replies here though, right? Well, yeah, there was a reply brief. There's no reply pleading, it was a little bit different. There was one, it's in our record. There is what we would call a reply brief in state court to our affirmative defenses, where each and every affirmative defense is applied. You know what I mean, the difference in federal pleadings and the state- Right. In federal pleadings, you don't have a reply. In Connecticut, you do. Yes. And it tees it up. I'm not talking about you didn't raise it in some writing. I'm just saying there was no reply, as we know. That's correct. He attempted to file something, but no matter what he filed, there was nowhere in our record where this plaintiff raises the identifiable person exception to governmental immunity. Your view is that that's forfeited. Some of these other state challenges are abandoned on appeal, but that was forfeited before the district court. Well, they were all forfeited based on not being argued, but there's an even better reason to not consider it now, because it has never been pled. It's not been raised adequately in our case to even be a factor. Haynes versus City of Middletown, 314 Connecticut, 303. May I ask you a larger question or a larger, bigger picture question, because I'm a little disturbed by what happened. Is it the policy of the city to use dogs in connection with cell extraction? All right. What's going on? Thank you for raising that. There's no such thing as an extraction dog, all right? There's no question the police had a mission to get this man from cell A to cell B. They had to do that because that was for his safety. The police dogs are just trained to bite and hold. They're a pain compliance asset and they're also a safety asset. They're patrol dogs. So whether the person's in a cell, whether they're running in the woods, whether they're cornered over here in a store or wherever. The dog's mission is to go to a soft fatty tissue area like the leg and bite and hold. And then the person goes on the ground and then the police can come and hopefully handcuff. Almost everybody stops fighting once they get bit by the dog. So it's not as if the mission of this dog was extract. I've never heard that. And there are extraction teams that get people from one place to another. There's no such thing as an extraction dog that grabs a person by the leg and then backs out. This is not helping you. No, it certainly is helping, Judge, because this is a fully trained patrol dog, all right? Had all of trained. There's no dispute of fact that this dog was fully trained and the dog bit and held. And the only reason why there's a serious injury is because the plaintiff fought. Dogs that specialize in a still extraction. Not that I've ever heard of. And I've never- And you investigated it? Yes, and you'd never- And you're representing to this court that there is no such thing as an extraction dog. I cannot say that there isn't some specialized team, maybe a SWAT team somewhere that might have a dog that. But I've done a lot of these cases for many years. I have never in my life heard of a dog, a patrol dog, whose part of his training is to go not just get somebody and hold him, but to actually drag him out of an area. So you're extracting him out of a cell. Either way, isn't it troubling? I mean, if there is an extraction dog, or use of a dog by an extraction team in such a way that the kinds of injuries that resulted in this case were available and weren't, it's not used, that's troubling. If there is no such thing as an extraction dog, then what you're saying is that in this case, a case where somebody is not a danger to himself. Not a danger to anybody, but perhaps to himself. And the idea is to move that person to a place where he's going to be safe. That a dog who bites and causes bodily injury is affirmatively used in this kind of situation. Well, see, when you say in this kind of situation, you have to remember what we're talking about. All this dog did was it put someone who was standing up who was in a tug of war with a baton. So when you say he wasn't a danger to anyone, that's not our undisputed facts. Our undisputed facts, he's struggling with the baton, potentially in possession of a deadly weapon. His job is to bite and hold, and that gets that person on the ground. His job was never, his command was never, get him out. He isn't trained to do that. There's no dog in the state- Maybe I should be a little bit more precise. Sorry? Maybe I should be a little bit more precise, because I understood at least one expert who said that the city is virtually alone in using dogs, maybe eliminate the word extraction, using dogs to go into a cell to subdue. Well- Is that correct? No, what the expert said is he hasn't heard of that, but what he's doing is he's defining his scenario and then saying, I haven't heard of it. Well, are you aware of any other municipality that uses dogs to go into a cell to subdue prisoners? To subdue, absolutely. Yeah, absolutely, but the key is it's just to subdue, and it's never the first choice, and it wasn't the first choice in our case. All right, and so that's the key. If there is a true extraction dog that's a specially trained dog that's somewhere on a special SWAT team in Los Angeles or Houston or somewhere like that that I don't know about, then the Fourth Amendment does not require every police department to have every possible asset. So there's no tool list, so to speak, of what you need to have in your department. This dog, it's undisputed, was fully trained to be a patrol dog, certified. It was trained to bite and hold. It did bite and hold. That's all it did. It was never asked to extract. It was never planned to extract. That's a word that's being invented by the plaintiffs to try and help the case along. Thank you very much. Thank you. Rebuttals, your honors? Yes, two minutes. Yes, your honor. Defense argues that this is a textbook use of force. To the contrary, your honors, none of Middletown's policies indicate that this is how you go about doing it. The expert testimony below indicates that this practically isn't done across the country and that the expert doesn't know of other jurisdictions that are actively engaging in it. And while defense counsel might argue that, in fact, this is happening, we don't have that evidence in the record here. And viewing the facts- I'm sorry to interrupt you, but- Yes, your honor. I'm clear. Your adversary made a distinction, I think, between use of dogs to extract, which is what I believe the expert was focused on, and using a canine to subdue someone who is in his or her cell. Is that a distinction that the expert focused on at all? No, your honor. And that's not a distinction we see anywhere in the record below. We're using extraction to talk about a dog being sent as an option in the first instance to go and get the prisoner. And in fact, to further show it's not a- And you're saying there are such dogs, extraction dogs? Your honor, we- Is that what you're saying, or you're saying that there are dogs used by extraction teams? We think it's plausible that these dogs could exist. There's a human rights watch report cited in the case that there are some dogs like this that may be down at Guantanamo, I think. And so, it is, I think, possible that you could train a dog for it. But the point here is the undisputed testimony, and even if it was disputed, it'd be in our favor, is that dogs aren't used for this. Officer Siebold himself, the officer who is coordinating the response here, he indicates this is something we don't normally do. And he says that in the- The sergeant also said something, the training sergeant. Correct. Correct, your honor. The training sergeant specifically says we don't train dogs to go into cells like this and extract people. And viewing the facts in the light most favorable to Mr. McKinney, a reasonable juror could find the decision to sick a German Shepherd on a mentally ill man in a cell excessive- What would be the training? I mean, what's the difference? I mean, the dog's going to subdue the person, whether he's running into the woods, he's running down the street, or he's in a cell. Are you saying that that training would be to bite the person and then drag the person out of the cell? That's the additional training that a dog would have for an extraction dog? Is that, what would be the different training? Your honor, the training might be for the dog to, once they have the person on the ground with officers over, to immediately let go. Whereas, viewing the facts in the light most favorable to Mr. McKinney. You know that? I mean, some expert told you that? That that's what the dog does, just kind of looks angry and the person goes down on the ground and then backs off. Does that, did Dr. McCauley say something like that? That could be an extraction dog? No, your honor. Dr. McCauley indicated this is, that dogs are not used to go into cells at all like this. And so I'm talking about what training possibly could happen. But viewing the facts- Can I ask you, does it matter with the setting, though? I mean, this is a Middletown, Connecticut police cell, where someone's just been arrested for armed robbery. This isn't Pelican Bay, where you have the ten trained members of the Department of Corrections of California, with the SWAT gear on, they know exactly what they're doing. This is kind of an unusual circumstance in a town like Middletown. Do they have the assets of an extraction team, or is this just two patrol officers trying to move this guy into a padded cell? And there's a police dog there to frighten the person to leave the cell and go willingly. Does it matter that it's not Atlanta or Pelican Bay or some real penitentiary where they do extractions all the time? I don't think so, your honors. It might be more reasonable if done at a penitentiary because they actually understand what to do and they're not sticking a weapon they're not as familiar with in a context they're not used to using it. So if anything, it would be more reasonable in an environment where the police were actually trained how to use this and with the injuries that could happen. But in this case, the officers and what their training showed they should do is overwhelm Mr. McKinney with bodies. That's what Officer Sebald indicated he would- When they could see through the video in the cell app, in the moments when he wasn't covering it with toilet paper, he was doing actions to cut himself in the wrist. Do you dispute that? No, your honor. Though the officers didn't come up until 50 minutes after that's no longer seen on the camera. So if that was the officer's real concern, they could have come up when that was happening and not one hour later. Thank you very much for your time, your honors. Thank you both, well argued. Court will reserve decision.